_____

|  |  |  |
|---|---|---|
| **SAMUEL CHENG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **09-40041-FDS** |
| | ) | |
| **SUNOCO, INC. (R&M),** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

**MEMORANDUM AND ORDER ON DEFENDANT'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a dispute arising out of a failed gas station franchise. Plaintiff Samuel Cheng has

brought suit in state court alleging that defendant Sunoco, Inc. (R&M) breached a contract with

him and engaged in unfair and deceptive business practices. Sunoco has removed the case to

federal court and filed counterclaims against Cheng for breach of contract, unjust enrichment, and

fraud. Sunoco has now moved for partial summary judgment on its declaratory judgment

counterclaim, which seeks a declaration from this Court that the franchise agreement between the

parties is unenforceable due to Cheng's fraudulent misrepresentations. For the reasons stated

below, the motion will be denied.

I.      **Factual Background**

The facts are set forth in the light most favorable to plaintiff.

A.      **The Franchise Agreement**

Samuel Cheng is a resident of Worcester, Massachusetts. Sunoco, Inc. (R&M) is a

corporation in the petroleum products industry with a principal place of business in Philadelphia, Pennsylvania.

From 1998 to 2002, Cheng and his brother operated a Sunoco gas station franchise in Worcester. (Cheng Dep. at 15-16). His contact at Sunoco was Judy Wallace, the division marketing manager. (*Id.* at 17). After a dispute over ownership and management of the franchise, Cheng transferred his ownership interest to his brother in 2002. (*Id.* at 15-16).

Sometime in 2003 or 2004, Cheng contacted Wallace to ask if Sunoco had any opportunities for a new franchise in the area. (*Id.* at 18; Wallace Dep. at 21). Wallace told Cheng that there might be a franchise available in Natick, Massachusetts. (Cheng Dep. at 18). Hoping to contract with Sunoco to run this Natick franchise, Cheng filled out an initial application that detailed his assets and liabilities and included an itemized list of funds that would be required to run the franchise. (*See id.*; Def.'s Mot. Summ. J., Ex. C). Wallace was not involved in filling out this first application. (Cheng Dep. at 21; Cheng Aff. ¶ 8).

Based on the first application, Sunoco's credit department conducted a credit check, which analyzed Cheng's financial situation for a favorable ratio of his assets to liabilities. (Wallace Dep. at 22, 24; Cheng Aff. ¶ 8). According to an affidavit submitted by Cheng, Wallace told him that his financial condition in the first application "was not strong enough" for Sunoco to grant the franchise. (Cheng Aff. ¶ 8). She suggested that in order for Cheng to pass the credit check, they "had to make the numbers better." (*Id.*; *see also id.* ¶ 9).[1] Cheng also spoke to a Sunoco employee based in Philadelphia who told him that he would need to come up with another

---

[1] Wallace testified that the credit representative suggested that Cheng "needed additional security based on what was probably uncovered in the credit report" in order for Cheng to get the franchise. (Wallace Dep. at 24).

$10,000 in assets before Sunoco would approve him to run the Natick franchise. (Cheng Aff. ¶ 9).

Cheng's affidavit asserts that he told Wallace about the Sunoco station that he and his brother had run together in Worcester. (*Id.* ¶ 12). He also informed her about the dispute between the brothers, which led Cheng to transfer his shares to his brother "without receiving a lump sum payment." (*Id.* ¶¶ 12, 13). Cheng told Wallace that "in [his] opinion, [he] was entitled to that payment even though [his] brother was not paying [him]." (*Id.* ¶ 13). He had also made Wallace aware that his income was $2,000 per month while he worked at the Worcester franchise. (*Id.*).

Cheng testified that Wallace told him to put "that figure" down on his financial statement under the "other income" section, as it would "make [his] income better as compared to the debts." (*Id.*). From the parties' submissions, it is unclear whether "that figure" referred to a single lump sum payment to which Cheng felt he was entitled, or whether it was a stream of the $2,000 per month based on Cheng's prior income from his work at the Natick station. Cheng testified that he "felt [he] was legally entitled to those payments from [his] brother" and that he "told . . .Wallace the truth." (*Id.* ¶ 14). In any event, on Cheng's second application, he listed $2,000 of monthly income under the "other income" section. (Def.'s Mot. Summ. J., Ex. C).[2] In his deposition, however, Cheng testified that he never actually "saw" or "physically" possessed the $2,000 per month of monthly income that appeared on his financial statement. (Cheng Dep. at

───────────────

[2] Cheng's signature appears on the application below a block of text that reads: "I submit the preceding information as my complete and true personal and financial condition . . . . I understand that Sunoco is relying upon all the above information as a material factor in considering my application to become a Sunoco Franchisee, and I therefore agree to promptly notify Company of any material change in any of the above information or any subsequent Information provided to Company." (Def.'s Mot. Summ. J., Ex. C).

64, 65). When asked why he listed this income, he responded that he did so "[p]robably to make the income look better." (Cheng Dep. at 65).

With this $2,000 monthly source of income listed on his financial statement, Cheng re-submitted his application to Sunoco. His financial condition was approved by Sunoco's credit department, and on September 24, 2004, he signed a dealer franchise agreement. (Def.'s Facts ¶¶ 9, 24; Def.'s First Am. Countercl. ¶ 9). Cheng then began operating the Sunoco franchise in Natick. (Def.'s First Am. Countercl. ¶ 11).

Wallace testified that after Cheng started running the Natick station, he told her about a $3,000 payment he made every month to his wife's parents. (Wallace Dep. at 46). One month after he purchased the franchise, Cheng moved to a new apartment that he rented in order to live closer to work. (Cheng Dep. at 9).[3] Neither of these obligations was listed under the "liabilities" section of Cheng's first or second application for a franchise. (Def.'s Facts ¶¶ 27, 29).

**B.    The Change in Payment Schedule**

Sunoco and Cheng initially began operating on a ten-day billing cycle, whereby Sunoco would deliver gasoline and an invoice to Cheng and he would pay for that gasoline delivery within ten days. (Cheng Aff. ¶ 16). Sunoco asserts that it "initially utilized a payment arrangement that was more lenient than called for under the franchise agreement." (Def.'s First Am. Countercl. ¶ 13). While on the ten-day billing cycle, Cheng sold gasoline at his franchise at a profit. (*Id.* ¶ 17).

Sometime later, Sunoco claims it notified "someone at the Marketing Premises" that it was changing the term of the billing cycle. (*Id.* ¶ 14). Cheng insists that no representative from

---

[3] The parties dispute the amount of the monthly rent of this apartment, but the amount is not material to the summary judgment determination. (*Compare* Cheng Dep. at 9 (stating that he paid between $600 and $700 per month), *with* Wallace Dep. at 46 (stating that the rent was $900 per month)).

Sunoco ever informed him of a change in his billing cycle. (Cheng Aff. ¶ 16). The parties agree that the franchise agreement provided: "All credit terms and methods of payment . . . may be amended or terminated at any time by Company, upon notification to dealer." (Def.'s First Am. Countercl. ¶ 10).

Soon after, Sunoco started billing Cheng on a two-day cycle. (Def.'s First Am. Countercl., Ex. 1). Cheng was unable to make payments for the gasoline deliveries on this timetable, which made him deficient on several payments. (*Id.*). In February 2005, Sunoco notified Cheng that he had $33,428 in outstanding payments due to Sunoco, and terminated his Natick franchise. (*Id.*). Cheng testified that Wallace later said, "Sunoco should never have put [Cheng] on the 10 day basis." (Cheng Aff. ¶ 16).

### C.    The Parties' Claims and Counterclaims

On October 31, 2008, Cheng sued Sunoco in Worcester Superior Court for breach of contract and for unfair and deceptive business practices in connection with the termination of his franchise. He demanded $150,000 in damages. Sunoco timely removed the action to this Court based on diversity jurisdiction. Sunoco also counterclaimed against Cheng for breach of contract, unjust enrichment, and fraud. In addition, Sunoco asserted a declaratory judgment count that asks the court to declare, among other things, that the agreement between Cheng and Sunoco is unenforceable because Cheng induced Sunoco to enter into the contract through fraud and intentional misrepresentation. Sunoco has now moved for summary judgment only on the declaratory judgment count.

## II.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Essentially, Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Analysis

Fraud in the inducement can provide a grounds for rescinding a contract. *See Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 224 (1st Cir. 2003). A party asserting a claim of common law fraud must demonstrate the following elements: (1) that the allegedly fraudulent statement was knowingly false; (2) that defendant made the false statement with intent to deceive; (3) that the statement was material to plaintiff's decision to sign the contract; (4) that plaintiff reasonably relied on the statement; and (5) that plaintiff was injured as a result of its reliance. *See id.* at 225; *see also Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1067 (Mass. App. Ct. 2003) (summarizing the elements of a common law claim of fraud or deceit); RESTATEMENT (SECOND) OF TORTS § 525 (1977).

The parties' main disagreement involves the first and second elements, which focus on the

knowledge and intent of the party making the allegedly false statements.[4]  In Sunoco's view, the evidence shows that Cheng knowingly misrepresented his income on the second franchise application by listing the additional $2,000 monthly income on his financial statement.  Sunoco points to Cheng's testimony that he listed the amount "[p]robably to make the income look better," despite the fact that he never actually received or possessed that income.  (Cheng Dep. at 64, 65).  Sunoco contends that this statement constitutes an admission that Cheng knew that claiming the $2,000 as monthly income was false, but included it in his application for the purpose of inducing Sunoco to enter into a contract.  Sunoco further contends that Cheng knowingly failed to list the $3,000 monthly payment to his wife's parents and the $900 monthly rent payment as liabilities.  Sunoco states that it reasonably relied on the information in Cheng's financial statement because it had no reason to believe that he would falsely report his income or omit monthly expenses.

Cheng disputes that he knowingly misstated his income.  First, he contends that he believed that he was legally "entitled" to the income from his prior ownership of the Worcester franchise.  Even though he never received these payments, he argues that his belief calls into question whether he knowingly made a false statement.  Second, Cheng contends that he only put down the $2,000 monthly stream of income at the suggestion of Wallace, Sunoco's representative.  Because, in Cheng's view, he was complying with the directions of Sunoco's agent in modifying his financial statement, he could not have knowingly defrauded Sunoco.

Under Massachusetts law, a party asserting a claim of fraud need not show that the

---

[4] Although the parties' memoranda have framed the matter in these terms, there also appears to be a dispute over the reasonableness of Sunoco's reliance on Cheng's allegedly false statements.

allegedly fraudulent statements were made with the specific purpose of inducing reliance. *See*

*Reisman*, 787 N.E.2d at 1067; *Zimmerman v. Kent*, 575 N.E.2d 70, 76 (Mass. App. Ct. 1991)

("under Massachusetts law plaintiffs need not prove that [the speaker] knew his statement to be

false") (citations omitted). The party need only demonstrate that it was among those who could

have reasonably been expected to rely on the misrepresentations. *See Reisman*, 787 N.E.2d at

1067 (noting that the "mental state element . . . is elucidated by § 531 of the Restatement");

RESTATEMENT (SECOND) OF TORTS § 531 (1977) ("One who makes a fraudulent

misrepresentation is subject to liability to the person or class of persons whom he intends or has

reason to expect to act or refrain from action in reliance upon the misrepresentation . . ."). 

Massachusetts law therefore treats the mental state inquiry for common law fraud as intertwined

with the reasonable reliance inquiry.

Whether Cheng would have reasonably expected Sunoco to rely on his alleged

misrepresentations is substantially complicated by Wallace's role in preparing the financial

statement. Cheng asserts that he informed Wallace about the nature of the $2,000 per month

representation on the financial statement. (Cheng Aff. ¶¶ 12, 13). Taking this evidence as true, a

reasonable jury could find that Cheng did not reasonably expect Wallace to rely to her detriment

on his listing of additional income of $2,000 per month. On this view, because she encouraged

this representation of Cheng's assets, she could not have relied on them as misstatements.

Sunoco contends that even if Wallace was aware of and encouraged the submission of

false information on Cheng's second financial statement, she would have been acting outside the

scope of her authority by suggesting to Cheng that he should misrepresent his income in order to

obtain a better credit rating. That may well be true, but there are no facts in the record that

8

establish the precise nature of Wallace's job at Sunoco or the scope of her employment. If Wallace was an agent of Sunoco acting within the scope of her authority in her dealings with Cheng, then the knowledge she acquired about his financial condition would be imputed to Sunoco. *See, e.g.*, *United States v. Josleyn*, 206 F.3d 144, 159 (1st Cir. 2000); *Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66 (1997). It is possible, of course, that Wallace acted adversely to Sunoco as a "faithless agent." *Lawrence Sav. Bank v. Levenson*, 797 N.E.2d 485, 490 (Mass. App. Ct. 2003). If so, her knowledge of Cheng's alleged misrepresentations need not be attributed to Sunoco. *See id.*; RESTATEMENT (SECOND) OF AGENCY § 282 (1958). But the question of whether an agent "acted on [her] own and against [her] employer's interests" is a question of fact for the jury to decide. *Lawrence*, 797 N.E.2d at 490 (citing *GTE Prod. Corp. v. Broadway Elec. Supply Co.*, 676 N.E.2d 1151, 1156 (Mass. App. Ct. 1997)).

Based on the record developed thus far, it is clear that there are disputed issues of fact with regard to the claim of fraud. Whether Cheng knowingly made a misstatement of material fact—that is, whether he made a misrepresentation upon which he could reasonably expect Sunoco to rely to its detriment—requires a reasonableness inquiry. Assessments of reasonableness are generally fact-dependent, and thus ordinarily should be left to the jury. *See, e.g.*, *Grant v. John Hancock Mut. Life Ins.*, 183 F. Supp. 2d 344, 370 (D. Mass. 2002). Furthermore, there are disputed facts concerning Wallace's alleged role in encouraging Cheng to list the additional $2,000 monthly stream of income. It is for the jury to determine whether Wallace went beyond the scope of her employment in her interactions with Cheng, and whether her knowledge of the nature of Cheng's assets can be attributed to Sunoco. *See Lawrence*, 797

N.E.2d at 490; *GTE Prod. Corp.*, 676 N.E.2d at 1156.  Summary judgment will therefore be denied.

**IV.**     **Conclusion**

For the foregoing reasons, defendant's motion for partial summary judgment is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: December 22, 2010